IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

SHAWN E.,
    Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,
    Defendant.

Case No. 1:19-cv-01049-JES-JEH

### Report and Recommendation

Now before the Court is the Plaintiff's Motion for Summary Judgment (Doc. 12) and the Defendant's Motion for Summary Affirmance (Doc. 16). This matter has been referred for a report and recommendation. The Motions are fully briefed, and for the reasons stated herein, the Court recommends the Plaintiff's Motion for Summary Judgment be denied and the Defendant's Motion for Summary Affirmance be granted.[1]

**I**

Shawn E. filed an application for disability insurance benefits (DIB) on February 2, 2015, alleging disability beginning on October 31, 2012. His claim was denied on August 27, 2015 and upon reconsideration on January 13, 2016. Shawn filed a request for hearing concerning his DIB application which was held before the Honorable Robert Schwartz (ALJ) on October 5, 2017. At that hearing, Shawn was represented by an attorney, and Shawn and a vocational expert (VE) testified. Following the hearing, Shawn's claim was denied on March 9, 2018. His request

---

[1] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears at (Doc. 8) on the docket.

for review by the Appeals Council (AC) was denied on January 11, 2019, making the ALJ's Decision the final decision of the Commissioner. Shawn filed the instant civil action seeking review of the ALJ's Decision on February 19, 2019.

## II

At the hearing, Shawn was 41 years old and lived with his wife. He claimed the following conditions limited his ability to work: Multiple Sclerosis (MS); seizures; depression; alcoholism; dyskinesia; and balance issues. AR 204. He had no difficulty with the flight of stairs up to his apartment. He drove almost daily. He had not driven at night in a very long time because of worsening night vision. He previously worked as a police officer, worked at a gas station, worked at a federal halfway house, and worked at Wal-Mart cleaning bathrooms.

Shawn was diagnosed with MS in 2002. He testified that he believed his current MS medication, Tecfidera, "really slowed down [his MS] – I haven't had any major flares since that one in 2016." AR 53. He said the Tecfidera, in pill form, was an easier medication for him and was easier for him and his wife to keep track of it to make sure he took it. The residual MS symptoms he had included "shakiness" in both hands and in his legs, his short-term memory was not "well," and he was "pretty weak." AR 53-54. He used a cane when he was outside his apartment. His left hand was worse than his right hand, but he said he did not "notice it as much now, because I've put it out of my mind, I guess." AR 54. He did not "feel pain a lot." AR 55.

Shawn confirmed he took Keppra for his history of seizures, and after he apparently missed several doses in early 2016 his wife took over his medication management. He was not aware of any side effects from the Tecfidera or Keppra.

He believed his medications, escitalopram[2] and mirtazapine[3], prescribed by treating psychiatrist Robert S. Hamilton, M.D. were "very effective." AR 57. Shawn testified that the mirtazapine helped him sleep and he got six or seven hours of sleep at night.

He thought his problems with short-term memory were due to his MS. "It's just tough for me to remember, you know, what to say, when I need to say it." AR 58. He was able to walk 0.7 miles before he had to sit down and rest as his balance would be off and his legs tired. He confirmed it was difficult to hold a pen and write, and his hand would shake such that letters became messed up and his writing would not look correct. He could think of nothing else that his hand shaking affected, except he commented that he held onto the steering wheel when driving "pretty tightly" so that his hand would not shake. AR 61. He said double vision, blurred vision could affect him during the day.

Upon questioning by his attorney, Shawn elaborated that the sensations in his left and right hands led to trouble holding onto things like pens, and he would lose his grip on thinner things like spoons or forks. He testified it took him "quite a while" to type a word or message on his tablet. AR 66. His hand shakiness was "pretty constant," but he had "gotten used to it, somewhat." *Id.* As for fatigue, Shawn noticed it if he did too much.

The VE next testified that an individual of Shawn's age, education, and work experience limited to sedentary work who would have the opportunity to use an assistive device while walking, who could never climb ladders, ropes, or scaffolds, who could climb ramps and/or stairs, stoop, kneel, crouch, and/or crawl no more than occasionally, who could balance no more than occasionally, who must avoid

---

[2] Used as an antidepressant. DORLANDS.COM, https://www.dorlands.com/dorlands/def.jsp?id=114181919 (last visited Apr. 8, 2020).
[3] An antidepressant. DORLANDS.COM, https://www.dorlands.com/dorlands/def.jsp?id=200020472 (last visited Apr. 8, 2020).

concentrated exposure to temperature extremes, and who could have no concentrated exposure to hazards could still do Shawn's past work as a customer service representative. Such a job required occasional reaching, handling, and fingering, occasional near vision, and occasional accommodation (shifting back and forth between near and far without disruption in the visual field). The VE believed the individual would need frequent near vision to perform Shawn's past job, and accommodation was "somewhat less of an issue, these days, because the computers are – contrast, enlargement of font, other things are much better than they were when this was written [in the Dictionary of Occupational Titles]." AR 73. There would be additional jobs for the hypothetical individual who was limited to no more than frequent near vision or accommodation and no more than frequent reaching, handling, and fingering. None of the identified jobs would allow for no more than occasional handling and fingering or for 20% off-task time.

### III

In his Decision, the ALJ determined Shawn had the following severe impairments: MS and seizure disorder. In his consideration of Shawn's medically determinable mental impairments of affective disorder, anxiety, and history of alcohol abuse, the ALJ addressed the four areas of mental functioning, the "paragraph B" criteria. As part of that analysis, the ALJ addressed Shawn's allegations of significant short-term memory issues and explained, "these are not well documented in his medical records and there has been no formal testing to corroborate or quantify his allegations." AR 28. The ALJ acknowledged Shawn's diagnosed depression "may affect his ability to concentrate." *Id*. The ALJ also pointed out that Shawn's mental status examinations did not show moderate or marked limitation in his focus or concentration. The ALJ determined that Shawn's medically determinable mental impairments were non-severe.

The ALJ made the following residual functional capacity (RFC) finding:

> [T]he claimant had the [RFC] to perform sedentary work as defined in 20 CFR 404.1567(a) except he must have the opportunity to use an assistive device while walking. He can never climb ladders, ropes, or scaffolds. He can climb ramps and/or stairs, balance, stoop, kneel, crouch, and/or crawl no more than occasionally. He can handle and finger no more than frequently and any work should not require constant near vision or accommodation. He must avoid concentrated exposure to temperature extremes and hazards, like unprotected heights or dangerous machinery.

AR 30. The ALJ detailed Shawn's hearing testimony, medical records dated between October 2012 and August 2017, MRI imaging several times throughout the period between his onset date and date last insured of December 31, 2017, the results of a December 2015 psychological consultative physical examination, a hospital visit in October 2012, an ER visit in January 2016, treating neurologist William H. Raino, M.D.'s August 2017 letter stating that Shawn was "medically . . . certainly and totally disabled from any gainful employment," and Shawn's wife's statements.

The ALJ summarized that Shawn did have a history of MS diagnosed in 2002, "but records since the alleged onset date do not confirm disabling limitations. He has followed up with a neurologist consistently, and treatment records show[ed] the MS is stable and with no reported flares." AR 33. Further, Shawn's MRI scans dated from 2012-2017 "confirm[ed] that the white matter lesions in his brain are stable with no new lesions or areas of enhancement," his physical examinations did not show he had developed disabling weakness or muscle atrophy, his physical examinations consistently noted he was able to ambulate without assistive devices, he had an okay gait, symmetric reflexes, 4/5-5/5 strength to all extremities, normal range of motion of the extremities, and only "slightly decreased sensation." *Id*.

Specifically, with regard to the opinions of record, the ALJ explained the State Agency assessments were:

> reasonably consistent with the medical evidence and [did] not conflict with specific functional limitations identified by treating or evaluating medical sources. Additional visual restriction is based on his allegations and the manipulative limitations are consistent with references in the record of mild dyskinesia.

AR 34. Dr. Raino's August 2017 letter was given "little weight." *Id.* Shawn's wife's statements "concerning the intensity, persistence and limiting effects of the claimant's symptoms [were] not consistent with the objective medical record, and the observations and physical examinations by [Shawn's] medical doctors, and [were] therefore not given great weight." *Id.*

## IV

Shawn argues: 1) the ALJ erred by failing to properly assess the treating opinions of record; 2) the Decision should be reversed because the ALJ's credibility assessment is patently wrong; 3) the ALJ erred in the RFC assessment and failed to adequately question the VE regarding Shawn's hand shakiness, blurry vision especially at night, fatigue, and naps; and 4) the AC erred by failing to remand the case in light of new and material evidence with a reasonable probability that the evidence would change the outcome of the Decision.

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the

6

ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability. *See* 20 C.F.R. § 404.1566. The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five-step test. *See* 20 C.F.R. § 404.1520. In the following order, the ALJ must evaluate whether the claimant:

1) currently performs or, during the relevant time period, did perform any substantial gainful activity;

2) suffers from an impairment that is severe or whether a combination of her impairments is severe;

3) suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

7

4)     is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and

5)     is unable to perform any other work existing in significant numbers in the national economy.

*Id.* An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

In the instant case, Shawn claims error on the ALJ's part at Steps Four and Five.

## A

### 1

Shawn argues that the ALJ erred by giving treating neurologist Dr. Raino's opinion "little weight," particularly where Dr. Raino was the only treating physician with significant insight into the combination of Shawn's conditions who gave an opinion as to his limitations. He also argues that Dr. Raino's assessment was not available to the state agency physicians and thus they did not have the opportunity to review that crucial treating physician documentation when giving their opinions. The Commissioner counters that the ALJ gave good reasons for discounting Dr. Raino's opinion.

20 C.F.R. § 404.1527(c) provides:

> How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

The listed factors include: 1) examining relationship; 2) treatment relationship, which in turn includes length of the treatment relationship and the frequency of examination, and the nature and extent of the treatment relationship; 3) supportability; 4) consistency; 5) specialization; and 6) other factors brought to the Social Security Administration's attention. *Id.* An ALJ must give controlling weight to the medical opinion of a treating physician only if the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence." 20 C.F.R. § 404.1527(c)(2).[4]

An ALJ must provide some explanation for his decision to discount a treating physician's opinion, and as long as the ALJ has "minimally articulated [his] reasons for rejecting the treating doctor's opinion," the decision must stand. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). Here, the ALJ observed Dr. Raino's August 2017 letter referred to Shawn's "considerable fatigue," among other symptoms, and provided that "medically [Shawn] is certainly totally disabled from any gainful employment." AR 34 (citing AR 587). That letter also provided that Shawn had done better on his current medication, Tecfidera; he continued to have considerable fatigue, cognitive decline, and problems with dyskinesias[5]; and because of his multiple problems he developed major depressive disorder which was recurrent and for which he saw a psychiatrist. The ALJ gave Dr. Raino's letter

---

[4] The treating physician rule found in 20 C.F.R. § 404.1527 has since been eliminated by the Social Security administration. However, the rules in § 404.1527 apply to claims filed before March 27, 2017.
[5] "Distortion or impairment of voluntary movement, as in tic, spasm, or myoclonus." DORLANDS.COM, https://www.dorlands.com/dorlands/def.jsp?id=100033093 (last visited Apr. 8, 2020).

9

"little weight" because: it was conclusory and addressed the ultimate determination reserved for the Commissioner; his statements in his letter were inconsistent with his treating records, for example, in an August 23, 2017 treatment note Dr. Raino reported that Shawn's dyskinesia "does not interfere greatly with his day-to-day activity" and he noted Shawn experienced no MS flare-ups on Tecfidera; and his treatment notes did not have references to ongoing and significant fatigue.

The ALJ certainly minimally articulated his reasons for rejecting Dr. Raino's August 2017 opinion. The ALJ's first stated reason – that Dr. Raino made a determination reserved for the Commissioner – was an accurate observation of the extent to which an ALJ must consider a treating doctor's opinion. Dr. Raino opined, "Given [Shawn's] array of problems medically he is certainly totally disabled from any gainful employment." AR 587. 20 C.F.R. § 404.1527(d) provides that statements by a medical source that a claimant is "disabled" or "unable to work" are not medical opinions but are, instead, opinions on issues reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(1). 20 C.F.R. § 404.1527(d)(3) expressly states, "We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section." Moreover, the remaining reasons the ALJ articulated – lack of consistency and supportability – find substantial support in the ALJ's discussion of the medical evidence of record.

The ALJ observed that Shawn testified and the medical record showed that his depression was stable and well controlled with medication. As for cognitive decline, the ALJ pointed out that Shawn's Function Report showed he was capable of multi-step tasks including driving a vehicle, caring for animals, cleaning, and shopping for groceries. As for Shawn's fatigue, the ALJ included Shawn's testimony that he experienced fatigue and napped during the day, and, as the

Commissioner points out, Dr. Raino's treatment notes merely included in January 2016 that Shawn was positive for daytime fatigue and in February 2017 Shawn's wife could tell sometimes just by looking at him that he was getting fatigued. The Court can trace the path of the ALJ's reasoning between such treatment notes and his conclusion that those treatment notes "did not have references to ongoing and significant fatigue." As for dyskinesia, the ALJ pointed out the instances Shawn was observed to have "abnormal" extremity movements, "very slight" dyskinesia type movements, "mild" dyskinesia, and "intermittent" muscle spasm movements in the extremities. AR 31, 32. The ALJ also pointed out that one treating doctor assessed Shawn's MS was stable except for mild dyskinesia "which has not caused him any difficulty," and Dr. Raino included in an August 2017 treatment note that Shawn was advised there were treatments to try if his dyskinesia became bothersome. AR 31 (citing 425) and AR 33 (citing 598). While Shawn argues Dr. Raino's opinion is "highly supported" by objective imaging showing "innumerable white matter lesions," the ALJ discussed the medical evidence of follow-up MRI imaging which provided in March 2013 that there were no definite new lesions or areas of enhancement, in January 2015 that there were white matter lesions that were not significantly changed compared to the previous March 2013 MRI, and in August 2017 that there were little changes since January 2015. Furthermore, the ALJ detailed that treating doctors indicated Shawn's MS was stable in November 2012 with medications, was fairly stable in May 2013, was fairly stable in March 2014, was fairly stable on Tecfidera in December 2014, and was fairly stable on Tecfidera in June 2015. The ALJ also noted the instances in the record when Shawn reported no MS flares, including in December 2015 when he had not taken his MS medication for two months because insurance would not cover it. Rather than having determined the significance of particular medical findings on his own, the ALJ clearly deferred to the treatment providers'

assessments of Shawn's MS. Finally, as an ALJ "need not rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians," it is of no moment that Dr. Raino's assessment was not available to the State Agency physicians when they gave their opinions. *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007).

## 2

Shawn also argues that the ALJ's Decision should be reversed because the ALJ failed to properly assess, or even mention, the opinion of treating psychiatrist Dr. Hamilton on January 13, 2017 that Shawn "really cannot work" given the combination of his MS and depression. Dr. Hamilton's Progress Note from January 13, 2017 initially provided in its entirety:

> Shawn is in for med management of his depression and insomnia. He is generally doing pretty well. He got dentures, and so is able to eat better. He has put on about 15 pounds, so that is positive. His mood is good. He is feeling well. Sometimes he does have still some trouble sleeping. He also has allergies, so he takes diphenhydramine, and when he takes the diphenhydramine he was not taking the mirtazapine. I did discuss with him the mirtazapine is primarily an antidepressant, and it would also be likely to help with his appetite. I think it is unlikely that he is going to have any trouble with the interaction between the mirtazapine and diphenhydramine, so I think it would be okay if he took them both together. I did advise him to call us if he does have trouble with taking the 2 together. Stressor-wise, his ex-wife is suing him for increased child support. He is hoping to get SSDI, and so with that he thinks he would be okay financially, but finances are really pretty tight for him. He has a retirement from the police department, and then his wife draws disability, so they both have some income, but not very high for either one, and he has the expenses, so anyway he is hopeful that the disability will come through, and he has multiple sclerosis along with the depression, and really cannot work, so hopefully that will come through for him.

AR 563-64. The Progress Note then went on to document a Review of Systems, Psychiatric Examination, and Medical Decision Making.

In a recent case before the Seventh Circuit Court of Appeals, a claimant argued that a doctor's statement in a note mandated specific attention because it "was patently an opinion speaking to [the claimant's] RFC; namely, whether [the claimant] was able to perform 8 hours a day, 5 days a week 'regular employment' on a 'regular and continuing basis.'" *Jeske v. Saul*, -- F.3d --, No. 19-1870, 2020 WL 1608847, at *9 (7th Cir. Apr. 2, 2020). The claimant reasoned that if the ALJ was not going to give that opinion significant weight, the ALJ needed to explain why. *Id*. The Seventh Circuit first made clear an "ALJ does have to consider opinions from medical sources on a claimant's RFC[,]" but that "an ALJ is not required to mention every piece of evidence." *Id*. The Seventh Circuit went on to explain that "[v]iewing [the doctor's] statement in context, rather than in isolation, it is clear that the comment was not his opinion about whether [the claimant] could work a full-time job[.]" *Id*. Accordingly, the Seventh Circuit determined the ALJ did not need to address the doctor's comment. *Id*. at 10.

*Jeske* guides the Court's analysis in this case. Indeed, the Commissioner in this case argues that Shawn has provided no context to the Court, but putting the notation that he "really cannot work" in context shows that the ALJ committed no error; given the context in which it was made, Shawn has not even shown that the notation was a "medical opinion" but was instead part of Dr. Hamilton's summary of Shawn's subjective statements. The content and context of Dr. Hamilton's statement make obvious it was not his opinion about whether Shawn could work a full-time job, and it was certainly not a medical opinion, as he argues. See 20 C.F.R. § 404.1527(a)(1) ("Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can

13

still do despite impairment(s), and your physical or mental restrictions"). It was an errant phrase that preceded a review of Shawn's systems, a psychiatric examination, and Dr. Hamilton's medical decisions on January 13, 2017. Thus, the ALJ escapes blame for failing to include Dr. Hamilton's notation that Shawn "really cannot work" pursuant to the well-established authority that he was not required to mention every piece of evidence. *Jeske,* 2020 WL 1608847, at *9 (citing *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008)).

**B**

Shawn next argues that the ALJ presented a skewed version of the medical evidence, and had the ALJ properly assessed the medical evidence of record he may have come to a different conclusion regarding the supportability of Shawn's statements concerning the intensity, persistence, and limiting effects of his symptoms. The Commissioner argues the ALJ considered a host of factors in accordance with SSR 16-3p and, conversely, Shawn speaks only in generalities and has not shown that the ALJ's subjective symptom assessment was patently erroneous.

As the Commissioner argues, the Court finds Shawn's argument in this regard underdeveloped. He makes the conclusory assertion that the ALJ's credibility assessment was patently wrong, cites the relevant Social Security regulation and Ruling, and cites some boilerplate law. As the Commissioner puts it, Shawn provides no elaboration. It is not the Court's obligation, in the first instance, to provide such elaboration. In any event, the Court can resolve of this issue in as brief a manner as Shawn presented it.

SSR 16-3p directs the ALJ to focus on the "intensity and persistence of the applicant's symptoms." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016). SSR 16-3p provides that all the evidence, including objective medical evidence, is to be considered in evaluating the intensity and persistence of an individual's

symptoms to "determine how [those] symptoms limit [the individual's] ability to perform work-related activities."  SSR 16-3p, at *2.  The ALJ must consider the claimant's subjective statements, the objective medical evidence, and factors relevant to symptoms including:  the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; medications and their side effects; non-medication treatments; any other measures used to relieve pain or other symptoms; and any other factors concerning the claimant's functional imitations and restrictions due to pain and other symptoms.  SSR 16-3p, at *7-8; 20 C.F.R. § 404.1529(c)(3).

Here, the ALJ considered:  Shawn's and his wife's subjective statements; the objective medical evidence of Shawn's seizures and MS; results of Shawn's mental status examinations; the medications he used to treat depression, seizures, and MS; and his daily activities such as driving a vehicle, caring for animals, cleaning, and shopping for groceries.  Furthermore, to the extent Shawn's argument in this regard is premised upon the ALJ's alleged failure to properly consider the medical opinions of record, the Court has already determined the ALJ committed no error in weighing the medical opinions of record.

## C

Shawn also argues that the ALJ erred by failing to confront the evidence Shawn would be off-task a significant portion of the day for his shaky hands, fatigue, and naps.  He argues that the ALJ's RFC assessment and questions to the ALJ were legally erroneous as neither incorporated those limitations or his blurry vision which were supported by the medical evidence in the record.  The Commissioner disputes the ALJ was obligated to find the record showed Shawn's symptoms to be as limiting as he alleged.  The Commissioner argues that, instead, the ALJ provided a detailed narrative in support of his RFC finding and subjective symptom assessment, did not doubt that Shawn experienced MS-related

15

symptoms or that they caused functional work limitations, and the hypothetical question the ALJ relied upon reflected his RFC finding and accounted for the limitations he found to be fully supported by the evidence.

An RFC assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p; *see also Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001) ("In assessing the claimant's RFC, the ALJ must consider both the medical and nonmedical evidence in the record"). "As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). To satisfy the substantial evidence standard, "the ALJ must build an accurate and logical bridge from the evidence to [his] conclusion" and "an ALJ may not ignore evidence that undercuts [his] conclusion." *Spicher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018).

Here, the ALJ built a logical bridge between the evidence of record and his RFC finding and hypothetical questions to the VE. As for Shawn's "shaky hands," the ALJ confronted Shawn's reports of hand shakiness and the medical records which noted his dyskinesia and mild tremor. However, the ALJ also confronted the evidence of Shawn's intact sensation, 4/5 strength, good sensation, mild dyskinesia which "has not caused him any difficulty" (AR 425), present grasp reflex, okay motor function, 5/5 upper extremity and grip strength, ability to grasp a pen, button a shirt, and turn a door knob normally, his dyskinesia which did not interfere greatly with his day-to-day activity, and his report that he had gotten used to his shakiness as it was every day and pretty constant. The ALJ explicitly explained that while Shawn alleged he experienced disabling shaking of his extremities, that was inconsistent with his treatment notes which revealed only

mild dyskinesia, and thus the ALJ limited Shawn to "frequent manipulative functions due to mild dyskinesia." AR 33. As for Shawn's fatigue and naps, the ALJ acknowledged Shawn's reports of fatigue, the need to nap, and his difficulty with sleep. But, as discussed *supra*, the ALJ properly considered Shawn's subjective statements and sufficiently explained why they were not consistent with the medical evidence and other evidence in the record, and the ALJ sufficiently explained why Dr. Raino's August 2017 letter which identified Shawn's "considerable fatigue" was entitled to only "little weight." As for Shawn's blurry vision, the ALJ included Shawn's report of blurred vision at night but noted Shawn did not seek treatment for any visual complaints, and his eye examination did not show significant deficits in his visual acuity or field of vision. Nevertheless, the ALJ limited Shawn to jobs that did not require constant near vision or accommodation "to account for [his reported vision issues]." AR 34.

The ALJ did not commit legal error in his assessment of the RFC or questioning to the VE, and Shawn's argument to the contrary essentially asks the Court to reweigh the evidence. *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (explaining that in reviewing an ALJ's decision, the court cannot reweigh evidence, resolve conflicts in the record, decide questions of credibility, or otherwise substitute its own judgment for that of the Commissioner).

## D

Finally, Shawn argues the AC erred by failing to remand this case in light of the new and material Neuropsychological Evaluation (Evaluation) performed by licensed clinical neuropsychologist Alexander P. Willett, Psy.D. that "completely contravenes multiple bases in which the ALJ laid the foundation of his decision denying [Shawn] benefits." Plf's MSJ (Doc. 13 at pgs. 15-16). He argues there is a reasonable probability this evidence would change the outcome of the Decision because this information undermines the foundation upon which the ALJ laid his

17

Decision – Shawn highlights that the ALJ found his major depressive disorder to be a non-severe impairment and also found he had the ability to use his hands up to two thirds of the work day as defined in the Dictionary of Occupational Titles. Shawn points out the following portions of the Evaluation: he exhibited telling deficits in cognition as well as motor functioning, falling well below the first percentile in both the finger tapping and grooved pegboard tests; and Dr. Willett stated "[Shawn] would likely benefit from continuing medication to help him better manage his depression." Plf's MSJ (Doc. 13 at pg. 16) (citing AR 9-18). The Commissioner argues the AC's denial of review is not reviewable, and Shawn has not satisfied the requirements for a Sentence Six remand. The Commissioner contends further that even if the Court concludes that it can review the AC's conclusion that the additional evidence does not relate to the period at issue, the additional evidence supports the AC's conclusion. In its Notice denying Shawn's request for review, the AC noted that Shawn submitted the additional evidence of the November 2018 Evaluation. The AC explained, "This additional evidence does not relate to the period at issue. Therefore, it does not affect the decision about whether you were disabled beginning on or before December 31, 2017." AR 2.

The Commissioner argues that the AC's ultimate judgment on whether additional evidence warrants review is discretionary and unreviewable. The Commissioner is incorrect. The Commissioner provides a somewhat lengthy discussion about the revised, current version of 20 C.F.R. § 404.970. The current version provides, in relevant part:

(a) The Appeals Council will review a case if –
* * *
> (5) Subject to paragraph (b) of this section, the Appeals Council receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision.

18

20 C.F.R. § 404.970(a)(5).  However, under the previous version of § 404.970, the Seventh Circuit Court of Appeals made clear that a court retains jurisdiction to review for legal error the AC's conclusion that newly submitted evidence is "non-qualifying under the regulation."  *Stepp v. Colvin*, 795 F.3d 711, 722 (7th Cir. 2015).  The Court agrees with the reasoning in *Steven D. A. v. Commissioner of Social Security* in which the court decided that the cases discussing the old version of § 404.970 "appear to still be applicable under the current version of the regulation. The new regulation does not make a substantive change, but simply incorporates the Seventh Circuit's understanding of materiality[.]"  No. 17-cv-819, 2018 WL 3438856, at *7 (S.D. Ill. July 17, 2018).  The Court therefore finds that it may review for legal error the AC's determination that Dr. Willett's Evaluation did not relate to the period at issue.

Once again, without elaboration, Shawn merely argues that the "facts before us also parallel *Farrell* because [Dr. Willet's Evaluation] 'relates to the period on or before the date of the administrative law judge hearing decision' as required by 20 C.F.R. § 404.970(b)."  Plf's MSJ (Doc. 13 at pg. 17) (citing *Farrell v. Astrue*, 692 F.3d 767 (7th Cir. 2012)).  In *Farrell*, the claimant argued the AC erred by refusing to consider her new evidence conforming a diagnosis of fibromyalgia in December 2008 after the ALJ's decision in November 2008.  692 F.3d at 771.  The Seventh Circuit determined such evidence built "on the allusions to possible fibromyalgia in [another doctor's] reports from 2005 and 2006."  *Id.*  Here, in contrast to *Farrell*, Dr. Willett's Evaluation, dated November 26, 2018, came almost a year after Shawn's date last insured and nearly nine months after the ALJ's Decision. Significantly, Shawn does not connect the dots between the Evaluation and the time period adjudicated by the ALJ to show that the Evaluation is "reasonably related" to that time period.  *See* HALLEX I-3-6-6 B. 2. ("Additional evidence

19

relates to the period on or before the date of the hearing decision if . . . the evidence post-dates the hearing decision but is reasonably related to the time period adjudicated in the hearing decision"). Shawn has failed to show that the AC erred. Because Sentence Six has no application to this case, the Court does not consider it. *See, e.g., DeGrazio v. Colvin*, 558 F. App'x 649, 652 (7th Cir. 2014) (unpublished opinion) ("The evidence that the Commissioner characterized as 'new' in her motion . . . was not new for purposes of sentence six because it already had been presented to the Appeals Council").

## V

For the reasons set forth above, it is recommended that: 1) the Plaintiff's Motion for Summary Judgment (Doc. 12) be denied; 2) the Defendant's Motion for Summary Affirmance (Doc. 16) be granted; 3) The Clerk of Court be directed to enter judgment as follows: "IT IS ORDERED AND ADJUDGED that the decision of the Defendant, Andrew Saul, Commissioner of Social Security, denying benefits to the Plaintiff, Shawn E., is AFFIRMED."; and 4) this matter be terminated.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) days after service of this Report and Recommendation. FED. R. CIV. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

*It is so recommended.*

Entered on April 8, 2020.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE